ALAN A. GREENBERG, State Bar No. 150827
  *AGreenberg@GGTrialLaw.com*
WAYNE R. GROSS, State Bar No. 138828
  *WGross@GGTrialLaw.com*
MICHAEL I. KATZ, State Bar No. 181728
  *MKatz@GGTrialLaw.com*
EVAN C. BORGES, State Bar No. 128706
  *Eborges@GGTrialLaw.com*
MICHAEL P. McMAHON, State Bar No. 258058
  *MMcMahon@GGTrialLaw.com*
**GREENBERG GROSS LLP**
650 Town Center Drive, Suite 1750
Costa Mesa, CA 92626
Telephone:  (949) 383-2800
Facsimile:  (949) 383-2801

MARK P. ROBINSON, JR., State Bar No. 054426
  *mrobinson@rcrsd.com*
KEVIN F. CALCAGNIE, State Bar No. 108994
  *kcalcagnie@rcrsd.com*
DANIEL S. ROBINSON, State Bar No. 244245
  *drobinson@rcrsd.com*
**ROBINSON CALCAGNIE ROBINSON
SHAPIRO DAVIS, INC.**
19 Corporate Plaza Drive
Newport Beach, CA 92660
Telephone:  (949) 720-1288
Facsimile:  (949) 720-1292

*Attorneys for Plaintiffs Timothy L. Strader, Sr.,
Lester L. Hall, Jr. and All Others Similarly
Situated*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIMOTHY L. STRADER, SR. and LESTER L. HALL, JR., individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>        v.<br><br>PHH CORPORATION, a Maryland corporation;<br>REALOGY HOLDINGS CORP., a Delaware | Case No. 8:15-CV-01973<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF § 8(a) OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT, 12 U.S.C. § 2607(a)**<br><br>**JURY TRIAL DEMANDED** |

corporation;
PHH MORTGAGE CORPORATION, a New
Jersey corporation;
PHH HOME LOANS LLC, a Delaware
limited liability company;
RMR FINANCIAL, LLC, a California limited
liability company;
NE MOVES MORTGAGE LLC, a
Massachusetts limited liability company;
PHH BROKER PARTNER CORPORATION,
a Maryland corporation;
REALOGY GROUP LLC, a Delaware limited
liability company;
REALOGY INTERMEDIATE HOLDINGS
LLC, a Delaware limited liability company;
TITLE RESOURCE GROUP LLC, a
Delaware limited liability company;
WEST COAST ESCROW COMPANY, a
California corporation;
TRG SERVICES ESCROW, INC., a
Delaware corporation;
NRT LLC, a Delaware limited liability
company;
REALOGY SERVICES GROUP LLC, a
Delaware limited liability company;
REALOGY SERVICES VENTURE
PARTNER LLC, a Delaware limited liability
company,

                    Defendants.

---

        Plaintiffs Timothy L. Strader, Sr. and Lester L. Hall, Jr., individually and on

behalf of all others similarly situated, allege as follows:

### NATURE OF THE ACTION

        1.      This is a class action by consumers seeking relief from the deceptive

and collusive practices of (a) mortgage lender and servicer PHH Corporation and its

subsidiaries and affiliates (collectively, "PHH"); (b) real estate conglomerate

Realogy Holdings Corp. and its subsidiaries and affiliates (collectively, "Realogy");

and (c) mortgage lender PHH Home Loans, LLC ("PHH Home Loans"), a joint

venture between PHH and Realogy.

2.     PHH, Realogy, and PHH Home Loans entered into an illegal arrangement whereby PHH Home Loans would refer title insurance and other settlement services to Realogy's subsidiary, TRG, in exchange for illegal kickbacks to PHH.  Under RESPA, consumers who paid fees and other charges for these settlement services from TRG are entitled to an award of treble damages based on the *full amount* paid for such settlement services pursuant to 12 U.S.C. § 2607(d)(2). As fully alleged herein, Plaintiffs seek recovery of treble damages for all consumers who paid fees and other charges for title insurance and other settlement services from TRG as a result of this illegal kickback scheme.

3.     PHH, Realogy, and PHH Home Loans – and their subsidiaries and affiliates – have violated the prohibition on referral fees and kickbacks in connection with residential mortgage loans under the Real Estate Settlement Procedures Act of 1974, as amended, 12 U.S.C. §§ 2601 *et seq.* ("RESPA"), and its implementing regulations, 12 C.F.R. §§ 1024.1 *et seq.* ("Regulation X").[1]  RESPA – and, in particular, the prohibition on referral fees and kickbacks in 12 U.S.C. § 2607 – was explicitly designed to protect consumers "from unnecessarily high settlement charges caused by certain abusive practices," such as those described in this Complaint.  12 U.S.C. § 2601(a).  As such, 12 U.S.C. § 2607(a) prohibits the giving or accepting of any "fee," "kickback," or "thing of value" in exchange for business incident to or part of a "settlement service" (as those terms are defined in RESPA and Regulation X and explained below) involving a federally related mortgage loan.

---

[1] Prior to December 30, 2011, Regulation X was located in 24 C.F.R. § 3500.1 *et seq.*  The content and structure were kept substantially identical when the regulation was moved to 12 C.F.R. § 1024.1 *et seq.* in conjunction with the shift of regulatory authority over RESPA from the United States Department of Housing and Urban Development to the Consumer Financial Protection Bureau as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act.  *See Edwards v. First Am. Corp.*, 798 F.3d 1172, 1179 (9th Cir. 2015).

4.      On January 31, 2005, PHH was spun off from Cendant Corporation ("Cendant"), the former parent of both PHH and Realogy, and entered into a Strategic Relationship Agreement ("SRA") with Cendant.  Cendant has since been replaced in that role by Realogy, its successor company, in conjunction with the formation of the PHH Home Loans joint venture.

5.      Since no later than January 31, 2005, Defendants have violated RESPA and distorted the market for title insurance and other settlement services in at least two principal ways.

6.      First, PHH and Realogy (as successor in interest to Cendant) created an "Affiliated Business Arrangement" ("ABA") – as that term is defined in RESPA and Regulation X and discussed below – called PHH Home Loans, which was and is a sham venture carefully engineered by the former affiliates to facilitate and disguise the payment of unlawful referral fees and kickbacks in exchange for the referral of title insurance and other settlement services to Realogy's subsidiary, Title Resource Group ("TRG").  PHH and Realogy, through their subsidiaries, hold 50.1% and 49.9%, respectively, of the membership interests in PHH Home Loans; and PHH, through its subsidiary, is the sole Managing Member in control of the venture.

7.      Prior to October 21, 2015, PHH was bound under the SRA to refer all title insurance and settlement services to TRG.  Each customer of PHH Home Loans paid TRG for title insurance and other settlement services.  PHH receives a variety of monetary and nonmonetary referral fees and kickbacks via its ownership and control of the sham ABA and PHH's intricate relationship with Realogy.

8.      Pursuant to the SRA, PHH Home Loans is the exclusively recommended mortgage lender for Realogy's vast real estate brokerage network, which is operated by Realogy's subsidiary, NRT LLC ("NRT"), and includes such recognizable brands as Coldwell Banker, Sotheby's International Realty, ZipRealty, The Corcoran Group, and Citi Habitats.

CLASS ACTION COMPLAINT

9.     Moreover, on information and belief, PHH receives a right of first refusal for the purchase of the mortgage servicing rights for PHH Home Loan originated mortgages, as evidenced by:  (a) the terms of the Limited Liability Company Operating Agreement for PHH Home Loans (the "Operating Agreement"), which permit PHH Home Loans to sell the servicing rights to PHH "on terms no less favorable" than those that could be obtained from an independent third party; and (b) the fact that PHH owns a disproportionate share of the servicing rights for those mortgages relative to PHH's overall market share of residential mortgage servicing.  The details of this arrangement, however, have never been publicly disclosed (and certainly not to the consumers who have paid the fees for the illegally referred services).

10.     Second, under the related Private Label Solutions ("PLS") model – in which PHH manages all aspects of the mortgage process for various banking institutions, including, but not limited to, Morgan Stanley, Merrill Lynch (a subsidiary of – and trade name for – Bank of America, N.A.), HSBC, and UBS (collectively, the "PLS Partners") – PHH directs the PLS Partners to refer title insurance and other settlement services to TRG without disclosing to consumers the existence of PHH's affiliation with TRG, *nor the fact that PHH was required* to *cause the PLS Partners to refer title insurance and other settlement services to TRG under the terms of the SRA.*  Similar to the PHH Home Loans customers, these consumers were charged by TRG for the referred services.

11.     On information and belief, PHH also receives disguised kickbacks and referral fees for the referrals made via the PLS Partners, in the form of, among other things, the right of first refusal over the purchase of the servicing rights to mortgages originated by PHH Home Loans, along with the economic benefits resulting from obtaining these servicing rights.

12.     This undisclosed mandatory referral arrangement existed for over 10 years until October 21, 2015, when PHH and Realogy amended the SRA to delete

1   the mandatory referral provision – as disclosed in a Form 10-Q filed on November

2   5, 2015 by PHH with the SEC.  A copy of PHH's recent 10-Q – which includes as

3   exhibits the SRA, the Operating Agreement, and the amendments to each –  is

4   attached as **Exhibit A**.

5       13.    The decision by PHH and Realogy to delete the mandatory referral

6   provision from the SRA, and particularly the timing of the decision, is telling.  Just

7   months prior to the amendment, PHH was found liable for similar RESPA violations

8   in connection with PHH's use of subsidiaries Atrium Insurance Corporation and

9   Atrium Reinsurance Corporation (collectively, "Atrium") to extract referral fees and

10  kickbacks disguised as mortgage reinsurance premiums from home buyers.

11      14.    On June 4, 2015, the Consumer Financial Protection Bureau ("CFPB")

12  issued a Decision of the Director in the Atrium matter which found PHH liable

13  under 12 U.S.C. § 2607(a) and ordered PHH to disgorge over *$109 million* in

14  illegally charged fees (an amount that would have been far greater were it not for a

15  three-year limit on the calculation of damages).  Also, as part of several injunctive

16  penalties in the decision, the CFPB enjoined "PHH from referring borrowers to *any*

17  *provider of a settlement service* if that provider has agreed to purchase a service

18  from PHH, and if payment for that service is triggered by the referrals.  This

19  provision seeks to prevent PHH from entering into illegal referral agreements with

20  respect to *any settlement service*, and it also applies for *15 years* from the date the

21  order becomes effective, as a further means of preventing PHH from committing

22  similar violations of RESPA."  (Emphasis added).  In leveling these and other

23  penalties, the CFPB noted in its decision that PHH's violations persisted for over 15

24  years and that there was no indication that PHH changed its practices due to their

25  illegality (as opposed to merely having become unprofitable), nor that PHH took

26  any steps to make future violations less likely.  The decision explains the extensive

27  injunctive penalties by noting "that referral agreements that violate [12 U.S.C. §

28  2607(a)] can be difficult to detect."  A copy of the decision is attached as **Exhibit B**.

15.     In addition to the enforcement authority granted to the CFPB, RESPA provides individual home buyers with a private right of action and imposes joint and several liability against each person involved in a kickback violation in an amount equal to three times the amount of any charge paid for the settlement service.  12 U.S.C. § 2607(d)(2).  The statute specifically entitles plaintiffs to three times *the actual amount paid for the settlement service*, not just the amount of any overcharge resulting from the illegal kickbacks or referral fees. *See Edwards v. First Am. Corp.,* 610 F.3d 514, 516-17 (9th Cir. 2010) (holding that private plaintiffs alleging kickback violations need not show that they were overcharged for the settlement service in order to recover treble damages based on the full amount paid). Moreover, courts have upheld the use of federal class actions to enforce kickback violations under RESPA.  *See, e.g., Edwards v. First Am. Corp.,* 798 F.3d 1172, 1185 (9th Cir. 2015) (reversing denial of class certification for alleged kickback violations under RESPA).

16.     This action seeks to redress consumers for Defendants' deceptive and collusive practices, which have suppressed competition in the market for title insurance and other settlement services.  Plaintiffs bring this action on their own behalf and on behalf of the hundreds of thousands of consumers who have been victimized by Defendants' illegal conduct.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 12 U.S.C. § 2614.  Jurisdiction is also proper in this Court under 28 U.S.C. § 1332(d) because the matter in controversy, exclusive of interest and costs, exceeds the sum of $5,000,000 and is a class action in which members of the class of plaintiffs are citizens of states different from Defendants.

18.     Venue is proper in this district under 28 U.S.C. § 1391(b) and 12 U.S.C. § 2614 because the real property involved in Plaintiffs' mortgage loan transactions is located in this district.  Further, a substantial part of the events or

-7-

omissions giving rise to the claims occurred in this district, and a substantial part of the property that is the subject of the action is situated in this district.

**PARTIES**

**A.      Plaintiffs**

19.      Plaintiff Timothy L. Strader, Sr. ("Mr. Strader") is an individual and citizen of California.  He resides in Newport Beach, California, in the County of Orange.

20.      Plaintiff Lester L. Hall, Jr. ("Mr. Hall") is an individual and citizen of California.  He resides in Santa Ana, California, in the County of Orange.

**B.      Defendants**

21.      Defendant RMR Financial, LLC ("RMR") is a California limited liability company founded in 2005, with its headquarters in Mount Laurel, New Jersey.  RMR does business under various trade names including Princeton Capital, Mortgage California, and First Capital.

22.      Defendant NE Moves Mortgage LLC ("NE Moves") is a Massachusetts limited liability company founded in 2005, with its headquarters in Waltham, Massachusetts.

23.      Defendant PHH Home Loans LLC ("PHH Home Loans") is a Delaware limited liability company founded in 2004, with its headquarters in Mount Laurel, New Jersey.  PHH Home Loans does business under various trade names in different regions, including Coldwell Banker Home Loans, Cartus Home Loans, Axiom Financial, and Sunbelt Lending Services.  PHH Home Loans holds a 100% ownership interest in RMR and NE Moves, and any reference to PHH Home Loans shall include RMR, NE Moves, and any other subsidiaries of PHH Home Loans, unless the context dictates otherwise.

24.      Defendant PHH Broker Partner Corporation ("PHH Partner") is a Maryland corporation formed in 1990, with its headquarters in Hunt Valley, Maryland.  PHH Partner has a 50.1% membership interest in PHH Home Loans.

CLASS ACTION COMPLAINT

25.     Defendant PHH Mortgage Corporation ("PHH Mortgage") is a New Jersey corporation formed in 1977, with its headquarters in Mount Laurel, New Jersey.  PHH Mortgage was formerly known as Cendant Mortgage Corporation.  All references to PHH Mortgage also include Cendant Mortgage Corporation, as its predecessor, where appropriate.

26.     Defendant PHH Corporation ("PHH") is a New Jersey corporation formed in 2001, with its headquarters in Mount Laurel, New Jersey.  PHH Corp. is the parent corporation and holds a 100% ownership interest in PHH Partner and PHH Mortgage, and any reference to PHH includes PHH Partner and PHH Mortgage, unless the context dictates otherwise.

27.     Defendant Realogy Services Venture Partner LLC ("Realogy Partner") is a Delaware limited liability company founded in 2004, with its headquarters in Parsippany, New Jersey.  Realogy Partner has a 49.9% membership interest in PHH Home Loans.  Realogy Partner is the successor in interest of Cendant Real Estate Services Venture Partner, Inc.  All references to Realogy Partner also include Cendant Real Estate Services Venture Partner, Inc., as its predecessor, where appropriate.

28.     Defendant Realogy Services Group LLC ("Realogy Services") is a Delaware limited liability company founded in 2004, with its headquarters in Parsippany, New Jersey.  Realogy Services was formerly known as Cendant Real Estate Services Group, LLC.  All references to Realogy Services also include Cendant Real Estate Services, LLC, as its predecessor, where appropriate.

29.     Defendant Title Resource Group LLC ("TRG") is a Delaware limited liability company founded in 1999, with its headquarters in Mount Laurel, New Jersey.  TRG was formerly known as Cendant Settlement Services Group, LLC ("CSSG").  All references to TRG also include Cendant Settlement Services Group, LLC, as its predecessor, where appropriate.  TRG does business under various trade names including Equity Title, US Title, Sunbelt Title, Texas American Title

CLASS ACTION COMPLAINT

1   Company, Market Street Settlement Group, Mid-Atlantic Settlement, and Burnet
2   Title.

3       30.    Defendant West Coast Escrow Company ("West Coast Escrow") is a
4   California limited liability company founded in 1984, with its headquarters in
5   Madison, New Jersey.  On information and belief, West Coast Escrow is a wholly
6   owned subsidiary of TRG.

7       31.    Defendant TRG Services Escrow, Inc. ("TRG Services") is a Delaware
8   corporation founded in 2007, with its headquarters in Madison, New Jersey.  On
9   information and belief, TRG Services is a wholly owned subsidiary of TRG.

10      32.    Defendant NRT LLC ("NRT") is a Delaware limited liability company
11  founded in 1997, with its headquarters in Madison, New Jersey.  NRT does business
12  under various trade names in different regions, including Coldwell Banker,
13  Sotheby's International Realty, Citi Habitats, The Corcoran Group, and ZipRealty.

14      33.    Defendant Realogy Group LLC ("Realogy Group") is a Delaware
15  limited liability company formed in 2006, with its headquarters in Madison, New
16  Jersey.  Realogy Group is the parent corporation and holds a 100% interest in
17  Realogy Partner, Realogy Services, TRG, and NRT.

18      34.    Defendant Realogy Intermediate Holdings LLC ("Realogy
19  Intermediate") is a Delaware limited liability company founded in 2006, with its
20  headquarters in Madison, New Jersey.  Realogy Intermediate is the parent
21  corporation and holds a 100% interest in Realogy Group.

22      35.    Defendant Realogy Holdings Corp. ("Realogy") is a Delaware
23  corporation founded in 2006, with its headquarters in Madison, New Jersey.
24  Realogy Holdings is the parent corporation and holds a 100% interest in Realogy
25  Intermediate, and any reference to Realogy includes Realogy Intermediate, Realogy
26  Group, and each of Realogy Group's subsidiaries, including Realogy Partner,
27  Realogy Services, TRG, and NRT, unless the context dictates otherwise.

28

# REGULATORY FRAMEWORK

**A.**   **RESPA Prohibits "Kickbacks" and "Things of value" in Exchange for Referral of Settlement Services**

36.     Congress passed RESPA in 1974 to promote competition within the real estate settlement industry and protect consumers from "unnecessarily high settlement charges caused by certain abusive practices."  12 U.S.C. § 2601(a).  One goal, in particular, was the "elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services."  12 U.S.C. § 2601(b).[2]  To this end, section 8 of RESPA, 12 U.S.C. § 2607, essentially bans settlement service providers from collecting unearned fees.

37.     Specifically, the statute proscribes referral fees, kickbacks and certain fee-splitting arrangements, which prior to RESPA's implementation drove up transaction costs charged to real estate purchasers without their knowledge.  Thus, section 8(a) prohibits certain business referral fees and provides:

> No person shall give and no person shall accept any fee, kickback, or *thing of value*[3] pursuant to any *agreement or understanding*,[4] oral or

---

[2]   [T]he term "Settlement services" includes any service provided in connection with a real estate settlement including, but not limited to, the following: title searches, title examinations, the provision of title certificates, title insurance, services rendered by an attorney, the preparation of documents, property surveys, the rendering of credit reports or appraisals, pest and fungus inspections, services rendered by a real estate agent or broker, the origination of a federally related mortgage loan (including, but not limited to, the taking of loan applications, loan processing, and the underwriting and funding of loans), and the handling of the processing, and closing or settlement . . . .
12 U.S.C. § 2602(3).

[3] "Thing of value" is broadly defined in RESPA and Regulation X.  *See* 12 U.S.C. § 2602(2) ("[T]he term "thing of value" includes any payment, advance, funds, loan, service, or other consideration . . . ."); 12 C.F.R. § 1024.14(d) ("Thing of value . . . includes, without limitation, monies, things, discounts, salaries, commissions, fees, duplicate payments of a charge, stock, dividends, distributions of partnership profits, franchise royalties, credits representing monies that may be paid at a future date, the opportunity to participate in a money-making program, retained or increased earnings, increased equity in a parent or subsidiary entity, special bank deposits or accounts, special or unusual banking terms, services of all types at special or free

-11-

otherwise, that business incident to or a part of a real estate settlement service involving a *federally related mortgage loan*[5] shall be referred to any person.

12 U.S.C. § 2607(a) (emphasis and footnotes added).[6]

38.     Further, section 8 specifies that "[a]ny referral of a settlement service is not a compensable service, except as set forth in § 1024.14(g)(1)," which sets forth all "fees, salaries, compensation, or other payments" permitted under section 8." 12 C.F.R. §1024.14(g), *codified at* 12 U.S.C. § 2607.  These include the payment of fees and salaries for services actually performed and goods actually furnished, as well as payments made pursuant to arrangements between real estate agents and brokers.  These limited exemptions remain unchanged.  *See* 12 U.S.C. § 2607(c)(1)-(3).

_____

rates, sales or rentals at special prices or rates, lease or rental payments based in whole or in part on the amount of business referred, trips and payment of another person's expenses, or reduction in credit against an existing obligation.  The term "payment" is used throughout §§ 1024.14 and 1024.15 as synonymous with the giving or receiving of any "thing of value" and does not require transfer of money.")

[4]     An agreement or understanding for the referral of business incident to or part of a settlement service need not be written or verbalized but may be established by a practice, pattern or course of conduct. When a thing of value is received repeatedly and is connected in any way with the volume or value of the business referred, the receipt of the thing of value is evidence that it is made pursuant to an agreement or understanding for the referral of business.

12 C.F.R. § 1024.14(e).

[5] "Federally related mortgage loan" is broadly defined in RESPA and Regulation X to include most residential mortgages, including refinancings and second mortgages. *See* 12 U.S.C. § 2602(1); 12 C.F.R. § 1024.2(b).

[6] In addition, section 8(b) makes illegal the splitting of charges such that:

No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

12 U.S.C. § 2607(b).

**B.** **"Affiliated Business Arrangements" Are Per Se Violations of Section 8 of RESPA Unless They Satisfy All Requirements of Section 8(c)(4)**

39.     In response to RESPA, many settlement service providers abandoned the classic kickback – where a specific payment was made in return for a specific referral and there was no other reason for the payment – and instead devised sophisticated transactions involving a less obvious causal link between the referral and the payment.  These transactions arose most frequently within the context of business arrangements where one settlement service provider maintained an enhanced relationship with a second provider of a different settlement service, through which each service provider captured the clients of the other.

40.     In turn, Congress enacted two significant amendments to section 8 to address instances in which no direct kickback or referral fee is paid.  First, Congress changed the calculation of damages from three times the amount of the kickback or referral fee to three times "any charge paid" for the settlement service.  12 U.S.C. § 2607(d)(2).  Thus, upon establishing a violation, a consumer is entitled to recover treble damages based on the full amount paid for the referred settlement service without the need to quantify the kickback or demonstrate any overcharge.  *See Edwards v. First Am. Corp.,* 610 F.3d 514, 518 (9th Cir. 2010) (finding that class action plaintiffs have standing to bring RESPA claims even when no overcharge can be established).

41.     Second, Congress defined and permitted "Controlled Business Arrangements" – since renamed "Affiliated Business Arrangements" ("ABAs") – only under limited circumstances designed to ameliorate their inherently abusive nature.  RESPA defines an ABA as:

> an arrangement in which (A) a person who is in a position to refer business incident to or a part of a real estate settlement service involving a federally related mortgage loan, or an associate of such person, has either an affiliate relationship with or a direct or beneficial ownership interest of more than 1 percent in a provider of settlement services; and (B) either of such persons directly or indirectly refers such business to that provider or affirmatively influences the selection of that provider.

-13-

1   12 U.S.C. § 2602(7).[7]

2   42.   ABAs are permitted, so long as they abide by *all* requirements

3   enumerated in section 8(c)(4):

4   Nothing in [Section 8] shall be construed as prohibiting . . . (4) affiliated
    business arrangements so long as (A) a *disclosure is made of the existence*
5   *of such an arrangement* to the person being referred and, in connection
    with such referral, such person is provided a written estimate of the charge
6   or range of charges generally made by the provider to which the person is
    referred . . . , (B) such person is not required to use any particular provider
7   of settlement services, and (C) *the only thing of value that is received*
    from the arrangement, other than the payments permitted under this
8   subsection, *is a return on the ownership interest or franchise relationship.*

9   12 U.S.C. § 2607(c)(4) (emphasis added).
10

11   43.   The regulations and case law interpreting the ABA provisions have

12   provided important clarifications.  Most significantly, courts have held that section

13   8(c)(4) is not merely an exemption.  Rather, all ABAs are *presumed* to be a violation

14   of section 8 and are permissible *only* if the three conditions in section 8(c)(4) are

15   satisfied.  *See, e.g., Bolinger v. First Multiple Listing Serv., Inc.,* 838 F. Supp. 2d

16   1340, 1355 (N.D. Ga. 2012) ("Section 8(c)(4) provides a cause of action

17   independent of Sections 8(a) and (b)."); *accord Minter v. Wells Fargo Bank, N.A.,*

18   274 F.R.D. 525, 538-39 (D. Md. 2011) ("ABAs not in compliance with the three

19   conditions of Section 8(c)(4) are per se violations. . . .  By statutory definition . . .

20   ABAs involve by virtue of their affiliation the transfer of a 'thing of value' in

21   exchange, explicitly or not, for referrals and such transfers are prohibited.").

22   44.   Also, regulators and courts have sought to curtail the abusive practice

23   of using the façade of a compliant ABA to insulate a business arrangement that has

24   as its primary purpose circumventing RESPA's kickback ban, as is the case with

25   PHH Home Loans.  In 1996, the United States Department of Housing and Urban

26   Development ("HUD"), which was at that time the regulatory body tasked with

27   ───────────────
     [7] The terms "associate" and "affiliate relationship" are defined in 12 U.S.C. §
28   2602(8) and 12 C.F.R. § 1024.15(c), respectively.

-14-

implementing RESPA,[8] issued a Statement of Policy to help identify these sham ABAs disguised as joint ventures. *See* 61 Fed. Reg. 29258, at \*29259 (June 7, 1996). Courts have looked to the ten-factor test found in HUD's policy statement to determine whether a particular joint venture is a permissible ABA, and have held that if a purported ABA "fails the HUD Ten Factor Test, the arrangement to which it is a party is a violation of RESPA."[9] *See Minter*, 274 F.R.D. at 543.

---

[8] The CFPB assumed this role as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

[9] The ten factors are: (1) Does the new entity have sufficient initial capital and net worth, typical in the industry, to conduct the settlement service business for which it was created? Or is it undercapitalized to do the work it purports to decide? (2) Is the new entity staffed with its own employees to perform the services it provides? Or does the new entity have "loaned" employees of one of the parent providers? (3) Does the new entity manage its own business affairs? Or is an entity that helped create the new entity running the new entity for the parent provider making the referrals? (4) Does the new entity have an office for business which is separate from one of the parent providers? If the new entity is located at the same business address as one of the parent providers, does the new entity pay a general market value rent for the facilities actually furnished? (5) Is the new entity providing substantial services, i.e., the essential functions of the real estate settlement service, for which the entity receives a fee? Does it incur the risks and receive the rewards of any comparable enterprise operating in the market place? (6) Does the new entity perform all of the substantial services itself? Or does it contract out part of the work? If so, how much of the work is contracted out? (7) If the new entity contracts out some of its essential functions, does it contract services from an independent third party? Or are the services contracted from a parent, affiliated provider or an entity that helped create the controlled entity? If the new entity contracts out work to a parent, affiliated provider or an entity that helped create it, does the new entity provide any functions that are of value to the settlement process? (8) If the new entity contracts out work to another party, is the party performing any contracted services receiving a payment for services or facilities provided that bears a reasonable relationship to the value of the services or goods received? Or is the contractor providing services or goods at a charge such that the new entity is receiving a "thing of value" for referring settlement service business to the party performing the service? (9) Is the new entity actively competing in the market place for business? Does the new entity receive or attempt to obtain business from settlement service providers other than one of the settlement services providers that created the new entity? (10) Is the new entity sending business exclusively to one of the settlement service providers that created it (such as the title application for a title policy to a title insurance underwriter or a loan package to a lender)? Or does the new entity send business to a number of entities, which may

-15-

45.     Thus, any arrangement involving an ABA is a per se violation of section 8 unless it is both a legitimate ABA (utilizing the ten-factor analysis employed by HUD and the courts) *and* meets all three requirements of section 8(c)(4).

## GENERAL FACTUAL ALLEGATIONS

### A.     PHH's Operations

46.     In its SEC filings and elsewhere, PHH touts itself as a leading non-bank mortgage originator and servicer of U.S. residential mortgage loans.  Through PHH Mortgage and its subsidiaries, PHH provides outsourced mortgage banking services to a variety of clients, including financial institutions and real estate brokers throughout the U.S. and is focused on originating, selling, and servicing residential mortgage loans.   According to *Inside Mortgage Finance*, PHH Mortgage was the fifth largest retail mortgage originator with a 4.7% market share for the nine months ending September 30, 2014.  *Inside Mortgage Finance* also reported that PHH Mortgage was the eighth largest mortgage loan servicer with a 2.3% market share as of December 31, 2014.

47.     PHH's business activities are divided into two operating segments: Mortgage Production (also referred to as mortgage origination) and Mortgage Servicing.

### 1.     Mortgage Production

48.     PHH's Mortgage Production segment, which accounted for approximately $231 million in revenue in 2014, provides private-label mortgage services to financial institutions and real estate brokers.  It generates revenue through fee-based mortgage loan origination services and the origination and sale of mortgage loans into the secondary market.  PHH Mortgage generally sells all

---

include one of the providers that created it?  61 Fed. Reg. 29258, at *29262.  The ten factors are to be considered in their totality and balanced appropriately in light of the specific facts of the business arrangement under review.  *Id.*

saleable mortgage loans that it originates to secondary market investors, which include a variety of institutional investors, and initially retains the servicing rights on mortgage loans sold.  The mortgage loans are typically sold within 30 days of origination and classified as held for sale until sold.  During 2014, 69% of PHH's mortgage loans were sold to, or were sold pursuant to, programs sponsored by Fannie Mae, Freddie Mac or Ginnie Mae and the remaining 31% were sold to private investors.

49.  PHH sources its mortgage loans through its retail and its wholesale/correspondent platforms.  Within the retail platform, it operates through two principal business channels:  PHH Private Label Solutions ("PLS") and a real estate joint venture with Realogy, PHH Home Loans.

50.  *Private Label Solutions.*  PHH offers complete mortgage outsourcing solutions to wealth management firms, regional banks, and community banks, including Merrill Lynch, Morgan Stanley, and HSBC – which represented 24%, 21%, and 10%, respectively, of PHH's total mortgage loan originations in 2014.  The PLS component of PHH's mortgage origination business accounted for 67% and 72% of its origination volume in 2013 and 2014, respectively.

51.  *PHH Home Loans.*  PHH Home Loans, which is more fully described below, is supported by PHH's relationship with Realogy, which represented 24% of PHH's mortgage originations in 2014 and 23% in 2013.

52.  *Wholesale/Correspondent.*  PHH also purchases closed mortgage loans from community banks, credit unions, mortgage brokers, and mortgage bankers, and also acquires mortgage loans from mortgage brokers that receive applications from and qualify the borrowers.  This wholesale/correspondent platform accounted for only 4% of PHH's originations in 2014, down from 10% in 2013.

## 2.  **Mortgage Servicing**

53.  PHH's Mortgage Servicing segment, which accounted for approximately $264 million in revenue in 2014, services mortgage loans originated

by PHH Mortgage, purchases mortgage servicing rights from others, and acts as a subservicer for certain clients that own the underlying servicing rights. PHH services loans on behalf of the owners of the underlying mortgage, and it has limited exposure to credit risk because it does not hold loans for investment purposes. PHH principally generates revenue in its mortgage servicing segment through contractual fees earned from its servicing rights primarily based on a percentage of the unpaid principal balance ("UPB"), or from its subservicing agreements, which are typically a stated amount per loan.

54.     PHH's stated corporate strategy, as disclosed in SEC filings, has been to position its mortgage business to be less capital intensive and to have more fee-based revenue streams. As a result, PHH grew the UPB of its subservicing portfolio from $40.8 billion at the end of 2012, to $96.3 billion at the end of 2013, and $113.4 billion at the end of 2014.

**B.     Realogy's Operations**

55.     Realogy claims in SEC filings and elsewhere to be the preeminent and most integrated provider of residential real estate services in the U.S. Realogy is the world's largest franchisor of residential real estate brokerages with some of the most recognized brands in the real estate industry, the largest owner of U.S. residential real estate brokerage offices, the largest U.S. and a leading global provider of outsourced employee relocation services, and a significant provider of title and settlement services.

56.     Realogy's revenue is derived on a fee-for-service basis, and given its breadth of complementary service offerings, Realogy is able to generate fees from multiple aspects of a residential real estate transaction. Realogy's operating platform is supported by its portfolio of industry leading franchise brokerage brands, in addition to non-franchise brands owned and operated through NRT. Realogy's multiple brands and operations allow it to derive revenue from many different

CLASS ACTION COMPLAINT

1  segments of the residential real estate market, in many different geographies, and at
2  varying price points.

3      57.    Realogy divides its operations into four segments, each of which
4  receives fees based upon services performed for its customers:  Real Estate
5  Franchise Services, Company Owned Real Estate Brokerage Services, Relocation
6  Services, and Title and Settlement Services.

7          **1.    Real Estate Franchise Services**

8      58.    Realogy is the largest franchisor of residential real estate brokerages in
9  the world through its portfolio of well-known brokerage brands, including Century
10  21, Coldwell Banker, Coldwell Banker Commercial, ERA, Sotheby's International
11  Realty, and Better Homes and Gardens Real Estate.  As of December 31, 2014,
12  Realogy's real estate franchise systems (inclusive of its company owned brokerage
13  operations) had approximately 13,500 offices worldwide in 104 countries and
14  territories.  This included approximately 6,000 brokerage offices in the U.S. and
15  approximately 251,300 independent sales associates worldwide, including
16  approximately 174,600 independent sales associates operating under its franchise
17  and proprietary brands in the U.S.  Realogy's franchisees pay Realogy fees for the
18  right to operate under one of its trademarks and to enjoy the benefits of the systems
19  and business enhancing tools provided by its real estate franchise operations.

20          **2.    Company Owned Real Estate Brokerage Services**

21      59.    Realogy, via subsidiary NRT, owns and operates the largest residential
22  real estate brokerage business in the U.S. under the Coldwell Banker, Corcoran
23  Group, Sotheby's International Realty, ZipRealty, and Citi Habitats brand names.
24  Realogy offers full-service residential brokerage services through more than 725
25  company owned brokerage offices with approximately 45,000 independent sales
26  agents in more than 45 of the 100 largest metropolitan areas of the U.S.  NRT, as the
27  broker for a home buyer or seller, derives revenues primarily from gross
28  commission income received at the closing of real estate transactions.  To

complement its residential brokerage services, NRT offers home ownership services that include comprehensive single-family residential property management in many of the nation's largest rental markets.

### 3.   Relocation Services

60.     Realogy, through subsidiary Cartus Corporation ("Cartus"), claims to be a leading global provider of outsourced employee relocation services.  Cartus is the largest provider of such services in the U.S. and also operates in several international relocation destinations.  Cartus offers a broad range of employee relocation services designed to manage all aspects of an employee's move.  The relocation services business serves corporations, including 56% of the Fortune 50 companies.  Cartus also services affinity organizations such as insurance companies and credit unions that provide Cartus's services to their members.  In 2014, Cartus assisted in over 171,000 corporate and affinity relocations in nearly 150 countries for approximately 1,100 active clients.

### 4.   Title and Settlement Services

61.     Through subsidiary TRG, Realogy assists with the closing of real estate transactions by providing full-service title and settlement (i.e., closing and escrow) services to customers, real estate companies – including Realogy's company owned real estate brokerage and relocation services businesses – as well as a targeted channel of large financial institution clients, including PHH.  In 2014, TRG was involved in the closing of approximately 141,000 transactions of which approximately 58,000 related to NRT.  In addition to its own title and settlement services, TRG also coordinates a nationwide network of attorneys, title agents, and notaries to service financial institution clients on a national basis.  TRG also serves as an underwriter of title insurance policies in connection with residential and commercial real estate transactions.

**C.** **Between 2005 and 2006, Cendant Spun Off Its Mortgage and Real Estate Services Divisions Into PHH and Realogy, Respectively, Which Remain Connected at the Hip**

62.    To understand how and why PHH and Realogy structured their intricately intertwined business dealings, it is important to consider their origins. Prior to February 1, 2005, PHH and Realogy were part of a single real estate conglomerate known as Cendant.

63.    When Cendant spun off PHH into its own company, Cendant and PHH sought to maintain coordination of their business practices (if not their prior corporate form). As PHH explained in a Form 10-K filed with the SEC on March 2 2009 (emphasis added):

> For periods between April 30, 1997 and February 1, 2005, we were a wholly owned subsidiary of Cendant (renamed Avis Budget Group, Inc.) and its predecessors that provided homeowners with mortgages, serviced mortgage loans, facilitated employee relocations and provided vehicle fleet management and fuel card services to commercial clients. On February 1, 2005, we began operating as an independent, publicly traded company pursuant to our spin-off from Cendant (the "Spin-Off"). In connection with the Spin-Off, we entered into several contracts with Cendant and Cendant's real estate services division to provide for the separation of our business from Cendant and ***the continuation of certain business arrangements with Cendant's real estate services division, including a separation agreement, a tax sharing agreement, a strategic relationship agreement, a marketing agreement, trademark license agreements and the operating agreement for PHH Home Loans, LLC***[.]

64.    Effective July 31, 2006, Cendant spun off its real estate services division into its own corporation, Realogy, but the ties between the businesses did not change. Rather, Realogy stepped into the shoes of Cendant for purposes of Cendant's real estate service arrangements with PHH.

**D.** **PHH and Cendant (Now Realogy) Executed an SRA and Formed the PHH Home Loans Joint Venture as Part of Their "Separation"**

65.    For purposes of this action, the most pertinent business agreements between PHH and Realogy are the Strategic Relationship Agreement ("SRA") and Limited Liability Company Operating Agreement of PHH Home Loans (the

1   "Operating Agreement").  PHH and Cendant, through their subsidiaries, executed

2   both agreements on January 31, 2005, the same day that PHH was spun off from

3   Cendant.

4         66.    As detailed below, the SRA describes an exchange of various rights

5   and other things of value amongst PHH, Cendant (now Realogy), various

6   subsidiaries and affiliates of both, and PHH Home Loans.  The SRA creates a joint

7   venture between subsidiaries of PHH and Realogy specifically to act as a sham

8   ABA to give PHH hidden kickbacks and referral fees in exchange for referral of title

9   insurance and other settlement services to a subsidiary of Realogy, TRG.  *See*

10  **Exhibit A**, Strategic Relationship Agreement.

11        67.    The Operating Agreement supplements the SRA by detailing the

12  operation of the joint venture and providing additional benefits to PHH.  PHH and

13  Realogy, through their subsidiaries PHH Partner and Realogy Partner, hold 50.1%

14  and 49.9% of the membership interests in PHH Home Loans; and PHH Partner is

15  the sole managing member in control of the joint venture.  Moreover, on

16  information and belief and as explained below, the Operating Agreement facilitates

17  the preferential transfer of lucrative mortgaging servicing rights to PHH Home

18  Loans.  *See* **Exhibit A**, Operating Agreement.

19  **E.     PHH Receives Crucial Benefits Under the SRA and Related Agreements**

20        68.    Of critical importance to PHH's business, the SRA provides that PHH

21  Home Loans is the *exclusively* recommended mortgage lender for the vast network

22  of Realogy-owned brokerages.  The SRA also provides PHH Home Loans access to

23  consumers attending trade shows, conventions, and conferences organized by

24  Realogy's brokerages.

25        69.    Under separate but related agreements, PHH Home Loans has the

26  exclusive right to use the Century 21, Coldwell Banker, and ERA brand names in

27  marketing its mortgage loan products; and PHH markets mortgage loan products to

28  Realogy's brokerage franchises and its Cartus relocation business.

70.     Moreover, PHH has acknowledged – including in a Form 10-K filed with the SEC on February 27, 2015 – that its mortgage origination business "is substantially dependent upon [its] relationship with Realogy."  According to the filing, 24% of PHH's mortgage loan originations during 2014 were derived from Realogy.

**F.   PHH Receives Additional, Undisclosed Benefits from Its Joint Venture with Realogy**

71.     On information and belief, PHH derives other benefits from its arrangements with Realogy that are not only hidden from individual consumers but from the public at large.

72.     As managing member under the Operating Agreement – via its subsidiary, PHH Partner – PHH is responsible for selling the mortgage loans originated by PHH Home Loans, including the lucrative servicing rights to those loans.  Moreover, the Operating Agreement expressly permits PHH to cause PHH Home Loans to sell the mortgages to PHH, so long as the terms are "no less favorable" than what an independent third party would pay.  In other words, PHH has the authority to sell servicing rights to itself, so long as PHH matches the price that would be paid by a competitor.  Thus, in effect, PHH has a right of first refusal to acquire lucrative servicing rights.

73.     PHH purports to sell the servicing rights for PHH Home Loans originated loans to the highest bidder.  Yet, PHH ends up acquiring a disproportionately large share of those servicing rights versus PHH's overall market share for mortgage servicing.

74.     PHH is able to acquire this disproportionate share of servicing rights through the foregoing right of first refusal, whereby PHH is permitted to purchase the rights at a price equal to the highest bid.  This right to match the highest bid is both immensely valuable for PHH and also detrimental, both to consumers and the

1    joint venture, because PHH's right of first refusal discourages other potential buyers

2    of the servicing rights from bidding.

3    **G.    PHH Home Loans *and* PHH Refer All Title Insurance and Other Settlement Services to TRG, Resulting in Marketplace Distortions and Increased Settlement Costs to Consumers**

4

5        75.    Realogy agreed to give PHH special rights with respect to the purchase

6    of servicing rights from PHH Home Loans, in part because both PHH Home Loans

7    *and* PHH (including by way of the PLS Partners) referred all title insurance and

8    other settlement services business to Realogy's subsidiary, TRG.

9        76.    In fact, PHH was bound under the SRA to refer – and cause each PLS

10   Partner to refer – all title insurance and settlement services to TRG.  Section 6.3 of

11   the SRA provides that "PHH shall, and shall cause its subsidiaries to (i) recommend

12   CSSG [now TRG] as provider of Settlement Services," "(ii) utilize [TRG] on an

13   exclusive basis," and "(iii) recommend [TRG] as provider of Settlement Services to

14   private label solutions ("PLS") partners . . . ."

15

Section 6.3 Settlement Services.

PHH shall, and shall cause its Subsidiaries to (i) recommend CSSG as provider of Settlement Services (including, without limitation, on all transactions where PHH or one of its Subsidiaries has the option to choose the provider of such services, all closings by mail, all *CONFIDENTIAL and all search products such as Property and Judgment Reports), (ii) utilize CSSG on an exclusive basis

*    The term "Confidential" indicates material that has been omitted and for which confidential treatment has been requested. All such omitted material has been filed with the Securities and Exchange Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended.

whenever PHH or one of its Subsidiaries has the option to choose the title or escrow agent and, in the applicable jurisdiction, CSSG either provides such services or receives compensation in connection with such services or both, and (iii) recommend CSSG as provider of Settlement Services to private label solutions ("PLS") partners and the Small Corps; provided, however, that: (a) during the first eighteen (18) months after the date of this Agreement, CSSG shall provide all such services at the pricing levels which existed immediately prior to execution of this Agreement (and, thereafter, agree to most favored nation status for such pricing); and (b) within one hundred eighty (180) days from the date of this Agreement, Cendant Real Estate shall cause CSSG to provide most favored nation status on service level agreements and processes that are consistent with existing CSSG service levels. PHH shall not, and shall cause its Subsidiaries not to, enter into any arrangement that provides for a party other than CSSG to provide the products and services set forth in (i) above to PHH's customers or its PLS partners' customers, unless such PLS partner requires an alternative provider as a condition to entering into or renewing such arrangement with PHH or such Subsidiary and then only after CSSG has been afforded the opportunity to present its service offerings to such PLS partner.

22       77.    Customers of PHH, PHH Home Loans, and each of the PLS Partners

23   were referred to TRG for title insurance and other settlement services and charged

24   fees by TRG for these services.  Customers trusted and relied that these referrals

25   were lawful and not part of an anti-competitive kickback scheme.

26       78.    PHH, PHH Home Loans, and each of the PLS Partners (at the direction

27   of PHH) made these referrals in exchange for the unlawful kickbacks described

28

-24-

above, causing the precise marketplace distortions and increased settlement costs that RESPA seeks to remedy.

79.    Thus, while not a required element of a section 8 claim under controlling law, all customers who were referred to TRG for title insurance and settlement services by PHH, PHH Home Loans, and each of the PLS Partners paid more for these services than they would have paid in the absence of the referrals and kickbacks.

80.    Indeed, as examples of further RESPA violations stemming from the mandatory referral provisions of the SRA, Realogy (through its brokerage subsidiaries), on information and belief, has implemented unlawful bonus structures and entered into other anti-competitive marketing agreements with its real estate managers and agents.  Among other things, bonus compensation paid to real estate managers is tied to the capture rate for settlement services and other referrals to affiliates.  In addition, the allocation of marketing funds to agents increases based on referrals to affiliates, all in connection with PHH Home Loans mortgages.

**H.    The PHH Home Loans Originated Mortgage Loans Violate Section 8 and Do Not Satisfy the ABA Exemption Requirements in Section 8(c)(4)**

81.    PHH and Realogy have sought to disguise the improper kickback of benefits to PHH in exchange for referrals of title insurance and other settlement services to TRG by forming the PHH Home Loans joint venture.

82.    Under the SRA, PHH and Reaology caused PHH Home Loans to refer title insurance and other settlement services to TRG in exchange for the benefits flowing to PHH described above, including the undisclosed right of first refusal for the purchase of the servicing rights for loans originated by PHH Home Loans.

83.    Defendants, however, failed to disclose the full nature of the relationships and business arrangements amongst PHH, PHH Home Loans, Realogy, and TRG to the customers who were referred to TRG, as explained above.

84.     Further, as discussed above, the purported ABA was in fact a sham venture designed to facilitate illegal kickbacks and referral fees.

85.     In addition, PHH's receipt of additional benefits in exchange for the referrals, as described above, was a "thing of value . . . received from the arrangement, other than . . . a return on the ownership interest or franchise relationship."

## I.    The PLS Originated Mortgage Loans Also Violate Section 8

86.     On information and belief, PHH caused the PLS Partners – including Merrill Lynch, Morgan Stanley, HSBC, and UBS, among others – to refer title insurance and other settlement services to TRG in exchange for the benefits flowing to PHH described above, including the undisclosed right of first refusal for the purchase of the servicing rights for loans originated by PHH Home Loans.

87.     Neither PHH, the PLS Partners, nor TRG disclosed to consumers that the title insurance and other settlement services were referred to TRG based on its relationship and arrangements with PHH, *nor did they disclose that PHH was contractually bound to cause each PLS Partner to recommend TRG as the exclusive provider of title insurance and other settlement services*.

88.     Rather, on information and belief, PHH and TRG intentionally misled consumers into believing that referrals to TRG were made solely at the discretion of the respective PLS Partner and based on the PLS Partner's opinion of the quality of TRG's services.

## J.    The Consumer Financial Protection Bureau Found PHH Liable for Similar Violations of Section 8 and Imposed Extensive Monetary and Injunctive Penalties

89.     On June 4, 2015, the Consumer Financial Protection Bureau ("CFPB") issued a Decision of the Director which found PHH liable under section 8 based on an additional illegal kickback scheme related to the payment of mortgage reinsurance premiums to subsidiaries of PHH – Atrium Insurance Corporation and Atrium Reinsurance Corporation (collectively, "Atrium"). *See* **Exhibit B**.

90.     Among the penalties imposed on PHH was the disgorgement of over *$109 million* in illegally charged fees.[10]  Also, the CFPB imposed extensive and long-lasting injunctive penalties, including enjoining "PHH from referring borrowers to *any provider of a settlement service* if that provider has agreed to purchase a service from PHH, and if payment for that service is triggered by the referrals.  This provision seeks to prevent PHH from entering into illegal referral agreements with respect to *any settlement service*, and it also applies for *15 years* from the date the order becomes effective, as a further means of fencing in PHH against the commission of similar violations of RESPA."  (Emphasis added).

91.     The CFPB explained in its decision that PHH's violations spanned roughly 18 years; that there was no indication that PHH changed its practices for any reason other than that the arrangement had simply ceased to be lucrative; and that PHH had not taken any steps to reduce the likelihood of future violations.  The decision further explains the broad injunctions by commenting "that referral agreements that violate section 8(a) can be difficult to detect."

**K.     PHH and Realogy Amended the SRA to Delete the Mandatory Referral Provision Shortly After the CFPB Issued Its Decision**

92.     Shortly after the CFPB issued its decision in the Atrium matter, PHH and Realogy suddenly amended the SRA to delete the mandatory, undisclosed provision requiring referral of settlement services to TRG described above, which had been in place for over 10 years – as disclosed in a Form 10-Q filed on November 5, 2015 by PHH with the SEC.  A copy of the amendment to the SRA is included in the attached **Exhibit A**.

_____

[10] This figure would actually have been substantially higher were it not for a three-year statute of limitations on regulatory actions under section 8 in place prior to the transfer of regulatory authority to the CFPB.  The decision limits liability to payments occurring on or after July 21, 2008, despite noting that PHH's RESPA violations began in 1995 and persisted for nearly two decades.

-27-

93.     On information and belief, PHH and Realogy amended the SRA because they knew the mandatory referral provision was a violation of section 8 of RESPA, 12 U.S.C. § 2607(a), and sought to limit future exposure.

## ALLEGATIONS SPECIFIC TO NAMED PLAINTIFFS

**A.     Class Representative Lester L. Hall, Jr. (PHH Home Loans Subclass)**

94.     On or about April 5, 2007, Mr. Hall purchased a house located at 1211 West River Lane in Santa Ana, California.

95.     Mr. Hall financed a portion of the purchase price with a loan from PHH Home Loans and executed a deed of trust securing the property for the benefit of PHH Home Loans.

96.     Mr. Hall was referred to TRG for both title insurance (under the trade name Equity Title) and other settlement services (via TRG subsidiary West Coast Escrow) in connection with the purchase.  Mr. Hall trusted and relied that the referrals were lawful and not part of an anti-competitive kickback scheme.

97.     Mr. Hall paid fees and other charges to Equity Title and West Coast Escrow for title insurance and other settlement services, respectively, in conjunction with the settlement of the mortgage loan.

98.     As a result of PHH's and PHH Home Loans' referral of TRG in exchange for the unlawful kickbacks described above, Mr. Hall paid more for these services than he would have paid in the absence of the referrals and kickbacks.

99.     Mr. Hall was not informed of the full nature of the business arrangements and affiliations involving PHH, PHH Home Loans, Equity Title, and West Coast Escrow, as explained herein.

**B.     Class Representative Timothy L. Strader. (PLS Subclass)**

100.   On or about April 22, 2011, Mr. Strader purchased a house located at 4 Rue Grand Ducal in Newport Beach, California.

101.   Mr. Strader financed a portion of the purchase price with a loan from one of the PLS Partners, Bank of America – doing business as Merrill Lynch – and executed a deed of trust securing the property for the benefit of Bank of America.

102.   Mr. Strader was referred to TRG for both title insurance (under the trade name Equity Title) and other settlement services (via TRG subsidiary TRG Services) in connection with the purchase.  Mr. Strader trusted and relied that the referrals were lawful and not part of an anti-competitive kickback scheme.

103.   Mr. Strader paid fees and other charges to Equity Title and TRG Services for title insurance and other settlement services, respectively, in conjunction with the settlement of the mortgage loan.

104.   As a result of the referral to TRG in exchange for the unlawful kickbacks to PHH described above, Mr. Strader paid more for these services than he would have paid in the absence of the referrals and kickbacks.

105.   On or about July 19, 2012, Mr. Strader refinanced his mortgage loan with Merrill Lynch and executed a new deed of trust and note in favor of Bank of America.

106.   Mr. Strader was again referred to TRG for both title insurance (under the trade name Equity Title) and other settlement services (via TRG subsidiary TRG Services) in connection with the purchase.  Mr. Strader again trusted and relied that the referrals were lawful and not part of an anti-competitive kickback scheme.

107.   Mr. Strader again paid fees and other charges to Equity Title and TRG Services for title insurance and other settlement services, respectively, in conjunction with the settlement of the mortgage loan.

108.   Mr. Strader was not informed in connection with either transaction that the referrals to Equity Title and TRG Services were made at the direction of PHH, nor that PHH was required under the terms of the SRA to refer, and cause Merrill Lynch to refer, all title insurance and settlement services to TRG.

1      109.   Mr. Strader was also not informed of the business arrangements and

2   affiliations involving PHH, Equity Title, and TRG Services, as explained herein.

3                        **CLAIM TOLLING ALLEGATIONS**

4      110.   "[A]lthough the limitations period in 12 U.S.C. § 2614 [governing

5   violations of 12 U.S.C. § 2607] ordinarily runs from the date of the alleged RESPA

6   violation, 'the doctrine of equitable tolling may, in the appropriate circumstances,

7   suspend the limitations period until the borrower discovers or had reasonable

8   opportunity to discover' the violation.'"  *See Merritt v. Countrywide Fin. Corp.,* 759

9   F.3d 1023, 1040 (9th Cir. 2014).  "[D]istrict courts may evaluate RESPA claims

10  case-by-case 'to determine if the general rule would be unjust or frustrate the

11  purpose of the Act and adjust the limitations period accordingly.'"

12     111.   Defendants concealed the nature of the relationships between PHH,

13  Realogy, PHH Home Loans, and TRG underlying Plaintiffs claims in this case.  The

14  details of the SRA – notably, that PHH Home Loans was the exclusively

15  recommended mortgage lender for Realogy's vast real estate brokerage network;

16  that PHH receives a right of first refusal for the purchase of the mortgage servicing

17  rights for PHH Home Loan originated mortgages; and that PHH was required to

18  refer, and cause the PLS Partners to refer, title insurance and other settlement

19  services to TRG under the terms of the SRA – were never publicly disclosed (and

20  certainly not to the consumers who have paid the fees for the illegally referred

21  services).

22     112.   Prior to November 5, 2015, when PHH and Realogy filed a Form 10-Q

23  with the SEC disclosing that they had amended the SRA to delete the mandatory

24  referral provision, Plaintiffs and others similarly situated did not have reasonable

25  opportunity to discover the violations alleged herein.

26     113.   Likewise, even through the exercise of due diligence, which Plaintiffs

27  and class members in fact exercised,  Plaintiffs and class members could not have

28  discovered Defendants' violations of Section 8(a) of RESPA prior to November 5,

-30-

2015, because Defendants did not disclose the nature of the relationships between PHH, Realogy, PHH Home Loans, and TRG in mortgage related disclosures to consumers, nor in their SEC filings.

114.   Although not required under controlling law for equitable tolling of the RESPA violations alleged herein, Defendants intentionally concealed the nature of their kickback scheme through, at best, incomplete and misleading disclosures that prevented customers, in the exercise of reasonable diligence, from discovering the existence of Defendants' section 8 violations.

115.   Running the limitations period from the date of the alleged violations would frustrate one of the major purposes the act – the "elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services."

## CLASS ACTION ALLEGATIONS

116.   Plaintiffs bring this action on behalf of themselves and the following subclasses (collectively, the "Class") pursuant to Rules 23(a), (b)(2), (b)(3), and (c)(5) of the Federal Rules of Civil Procedure:

### *The PHH Home Loans Subclass*

*All persons who (1) obtained a federally related mortgage loan (as that term is used in RESPA) from PHH Home Loans (or one of its subsidiaries) on or after January 31, 2005; and (2) paid a fee for title insurance or other settlement services to TRG (or one of its subsidiaries).*

### *The PLS Subclass*

*All persons who (1) obtained a federally related mortgage loan (as that term is used in RESPA) from one of the PLS Partners on or after January 31, 2005; and (2) paid a fee for title insurance or other settlement services to TRG (or one of its subsidiaries).*

117.   Excluded from the Class are Defendants; Defendants' subsidiaries and affiliates; any entity in which any Defendant has a controlling interest; any and all employees of Defendants; any successor or assign of the Defendants; governmental

1   entities; the judge to whom this case is assigned and his or her immediate family;
2   and all persons who make a timely election to be excluded from the Class.

3       118.   Plaintiffs reserve the right to revise the definition of the Class based
4   upon information learned through discovery.

5       119.   *Numerosity*.  Pursuant to FRCP 23(a)(l), the members of the Class are
6   so numerous and geographically dispersed that individual joinder of all Class
7   members is impracticable.  The precise number of Class members is unknown to
8   Plaintiffs, but Plaintiffs are informed and believe that there are not less than
9   hundreds of thousands of members of the Class.  The precise number and identity of
10  Class members is ascertainable from Defendants' books and records.  Class
11  members may be notified of the pendency of this action by recognized, Court-
12  approved notice dissemination methods, which may include U.S. mail, electronic
13  mail, Internet postings, and/or published notice.

14      120.   *Commonality and Predominance*.  Pursuant to FRCP 23(a)(2) and
15  23(b)(3), this action involves common questions of law and fact, which predominate
16  over any individual questions with respect to Class members, including, without
17  limitation:

18          a.  Whether Defendants engaged in the conduct alleged in this Complaint;
19          b.  The nature of the relationships of Defendants to one another;
20          c.  The nature of the benefits exchanged by PHH and Realogy under the
21              terms of the SRA and otherwise;
22          d.  Whether Defendants gave and accepted benefits in exchange for the
23              referral of settlement services, and if so, the nature and extent of such
24              benefits and services; and
25          e.  Whether Defendants' relationships with each other, and exchange of
26              benefits violated section 8 of RESPA

27      121.   *Typicality*.  Pursuant to FRCP 23(a)(3), the claims of the named
28  Plaintiffs are typical of the claims of the Class because, among other things, all

-32-

members of the Class executed mortgage loans and paid similar, if not identical, amounts for title insurance and other settlement services based on the allegations in this Complaint.  Furthermore, Mr. Hall's claims are typical of the claims of the PHH Home Loans Subclass because, among other things, all members of the PHH Home Loans Subclass executed mortgage loans from PHH Home Loans and received similar, if not identical, disclosures that failed to adequately state the full nature of the relationship between the lender and the provider of title insurance and other settlement services.  Mr. Strader's claims are typical of the claims of the PLS Subclass because, among other things, all members of the PLS Subclass executed mortgage loans from one of the PLS Partners and did not receive any disclosure regarding the relationship of PHH and the provider of title insurance and other settlement services.

122.  *Adequacy.*  Pursuant to FRCP 23(a)(4), Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members.  Likewise, Plaintiffs' counsel is competent and experienced in prosecuting complex class action cases.  The Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

123.  *Superiority.*  Pursuant to FRCP 23(b)(3), a class action is the best available method to adjudicate this controversy.  This action involves common questions of fact and law, as described above.  Moreover, prosecution of the action will require targeted discovery on complex issues and could not practically be pursued by individual litigants.  Plaintiffs and other Class members' damages are relatively small compared to the burden and expense that would be required to individually litigate the claims.  In addition, individual litigation of Class members' claims would be impracticable and unduly burdensome to the court system and has the potential to lead to inconsistent results based on identical conduct.  A class action provides the benefits of a single adjudication, economy of scale, and comprehensive supervision of a single court.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Violation of § 8(a) of the Real Estate Settlement Procedures Act,

### 12 U.S.C. § 2607(a)

(On Behalf of Mr. Hall and the PHH Home Loans Subclass Against PHH, PHH Mortgage, PHH Home Loans, RMR Financial, NE Moves Mortgage, PHH Partner, Realogy Holdings, Realogy Intermediate, Realogy Group, Realogy Partner, Realogy Services, TRG, TRG Services,West Coast Escrow, and NRT)

124.   Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 123, as though fully incorporated herein.

125.   12 U.S.C. § 2607(a) provides that "[n]o person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person."

126.   As alleged above, PHH and Realogy created a joint venture called PHH Home Loans, which was and is a sham venture carefully engineered by the former affiliates to facilitate and disguise the payment of unlawful referral fees and kickbacks in exchange for the referral of title insurance and other settlement services to Realogy's subsidiary, TRG.  PHH and Realogy, through their subsidiaries, hold 50.1% and 49.9%, respectively, of the membership interests in PHH Home Loans; and PHH, through its subsidiary, is the sole Managing Member in control of the venture.

127.   PHH was required under the SRA to refer, and to cause its subsidiaries to refer, all title insurance and settlement services to TRG.

128.   Class members who obtained a federally related mortgage loan from PHH Home Loans were referred to TRG for title insurance and other settlement services.

129.   Based on the foregoing, Realogy, PHH, and PHH Home Loans entered into "an agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan" shall be referred to TRG.

130.   As a result of PHH Home Loans' referral of TRG, Mr. Hall and each member of the PHH Home Loans Subclass paid fees and other charges for title insurance and other settlement services to TRG as a customer of PHH Home Loans, which was "business incident to or part of" the federally related mortgage loan obtained from PHH Home Loans by Mr. Hall and the PHH Home Loans Subclass.

131.   Pursuant to the SRA, PHH Home Loans is the *exclusively* recommended mortgage lender for Realogy's vast real estate brokerage network. The SRA also provides PHH Home Loans access to consumers attending trade shows, conventions, and conferences organized by Realogy's brokerages.

132.   As alleged above, PHH receives what effectively and in practice amounts to a right of first refusal for the purchase of the mortgage servicing rights for PHH Home Loan originated mortgages, along with the economic benefits resulting from obtaining these servicing rights.

133.   Realogy, PHH, and TRG created and received a "fee, kickback, or thing of value" by making PHH Home Loans the exclusively recommended mortgage lender for Realogy's vast real estate brokerage network; granting PHH Home Loans the exclusive right to use the Century 21, Coldwell Banker, and ERA trade names to market its mortgage products; providing PHH Home Loans access to consumers attending trade shows, conventions, and conferences organized by Realogy's brokerages; giving PHH a right of first refusal for the purchase of the mortgage servicing rights for PHH Home Loan originated mortgages; and providing the other benefits to PHH alleged herein.

134.   These fees, kickbacks and things of value were provided and made pursuant to PHH and Realogy's agreement, under the SRA and otherwise, that title

insurance and other settlement services shall be referred to TRG, and thus violated 12 U.S.C. § 2607(a).

135.  In addition, PHH, Realogy, PHH Home Loans, and TRG entered into an ABA that constitutes a per se violation of 12 U.S.C. § 2607(a).

136.  PHH and Realogy entered into an arrangement in which PHH Home Loans would refer title insurance and settlement services involving federally related mortgage loans to TRG.  Realogy, the parent corporation of TRG, has a 100% ownership interest (*i.e.*, more than 1 percent) in TRG.  Likewise, because Realogy has a 49.9% membership interest in PHH Home Loans, PHH Home Loans has an affiliate relationship with TRG.

137.  Therefore, PHH, PHH Home Loans, Realogy, and TRG were part of an ABA that constitutes a per se violation of 12 U.S.C. § 2607(a), *unless* Defendants can establish that the ABA was formed for legitimate purposes *and* complied with all requirements of 12 U.S.C. § 2607(c)(4).

138.  The ABA alleged herein involving PHH, Realogy, PHH Home Loans, and TRG does not qualify as a permissible ABA for the following independent reasons:  (a) PHH Home Loans was a sham venture designed to facilitate illegal kickbacks and referral fees; (b) Defendants failed to disclose the full nature of the relationships and business arrangements amongst PHH, PHH Home Loans, Realogy, and TRG, as explained above; and (c) PHH received benefits in excess of the return on its ownership interest in PHH Home Loans.  Thus, the arrangement involving PHH, PHH Home Loans, Realogy, and TRG constituted a per se violation of 12 U.S.C. § 2607(a).

139.  12 U.S.C. § 2607(d) provides that "[a]ny person or persons who violate the prohibitions or limitations of this section shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service."

140.   As alleged herein, Mr. Hall and each member of the PHH Home Loans Subclass paid fees and other charges to TRG for title insurance and settlement services as a customer of PHH Home Loans.

141.   Therefore, Defendants are jointly and severally liable to Mr. Hall and each member of the PHH Home Loans Subclass for three times the amount of all fees and other charges paid to TRG for title insurance and other settlement services, for each federally related mortgage loan that Mr. Hall and the PHH Home Loans Subclass members obtained from PHH Home Loans.

## SECOND CAUSE OF ACTION

### Violation of § 8(a) of the Real Estate Settlement Procedures Act,

### 12 U.S.C. § 2607(a)

(On Behalf of Mr. Strader and the PLS Subclass Against PHH, PHH Mortgage, Realogy Holdings, Realogy Intermediate, Realogy Group, Realogy Services, TRG, TRG Services, and West Coast Escrow)

142.   Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 141, as though fully incorporated herein.

143.   12 U.S.C. § 2607(a) provides that "[n]o person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person."

144.   As previously alleged herein, under the PLS model, PHH directed the PLS Partners – for whom PHH manages all aspects of the mortgage process – to refer title insurance and other settlement services to TRG without disclosing to consumers the existence of PHH's affiliation with TRG, nor the fact that PHH was required to cause the PLS Partners to refer title insurance and other settlement services to TRG under the terms of the SRA.  Every person who obtained a federally related mortgage loan from a PLS Partner was referred to TRG for title insurance and other settlement services.

1    145.   Therefore, Realogy and PHH entered into "an agreement or

2  understanding, oral or otherwise, that business incident to or a part of a real estate

3  settlement service involving a federally related mortgage loan" shall be referred to

4  TRG.

5    146.   Similar to the PHH Home Loans customers, as a result of the PLS

6  Partners' referral of TRG, Mr. Strader and each member of the PLS Subclass paid

7  fees and other charges for title insurance and other settlement services to TRG.

8    147.   On information and belief, Realogy, PHH, and TRG created and

9  received a disguised "fee, kickback, or thing of value" for the referrals made via the

10  PLS Partners, in the form of, among other things, the right of first refusal over the

11  purchase of the servicing rights to mortgages originated by PHH Home Loans, along

12  with the economic benefits resulting from obtaining these servicing rights.

13    148.   As previously alleged herein, these fees, kickbacks and things of value

14  were made pursuant to PHH and Realogy's agreement, under the SRA and

15  otherwise, that title insurance and other settlement services shall be referred to TRG,

16  and that PHH shall cause each PLS Partner to refer title insurance and other

17  settlement services to TRG.

18    149.   12 U.S.C. § 2607(d) provides that "[a]ny person or persons who violate

19  the prohibitions or limitations of this section shall be jointly and severally liable to

20  the person or persons charged for the settlement service involved in the violation in

21  an amount equal to three times the amount of any charge paid for such settlement

22  service."

23    150.   As alleged herein, Mr. Strader and each member of the PLS Subclass

24  paid fees and other charges to TRG for title insurance and other settlement services

25  as a customer of a PLS Partner.

26    151.   Therefore, Defendants are jointly and severally liable to Mr. Strader

27  and the PLS Subclass for three times the amount of all fees and other charges paid to

28

CLASS ACTION COMPLAINT

1  TRG for title insurance and other settlement services, for each federally related

2  mortgage loan that Mr. Strader and the PLS Subclass obtained from a PLS Partner.

3                              **PRAYER FOR RELIEF**

4          152.       WHEREFORE, Plaintiffs, individually and on behalf of

5  members of the proposed Class, respectfully request that the Court enter an order

6  and judgment against Defendants as follows:

7          a)     An order certifying the proposed PHH Home Loans Subclass and PLS

8                 Subclass;

9          b)     An order appointing Plaintiffs' counsel as Class Counsel for the

10                proposed Class and Subclasses;

11         c)     An order awarding treble damages to Plaintiffs and all Class members

12                pursuant to 12 U.S.C. § 2607(d)(2);

13         d)     An order awarding costs and attorneys' fees to Plaintiffs' Class

14                Counsel pursuant to 12 U.S.C. § 2607(d)(5);

15         e)     An order requiring Defendants to pay pre-judgment and post-judgment

16                interest on any amount awarded; and

17         f)     Such other relief that the Court deems appropriate.

18

19

20

21

22

23

24

25

26

27

28

DATED: December 10, 2015

By:      /s/ Michael I. Katz
_____
Alan A. Greenberg
Wayne R. Gross
Michael I. Katz
Evan C. Borges
Michael P. McMahon
**GREENBERG GROSS LLP**
650 Town Center Drive, Suite 1750
Costa Mesa, CA 92626
Telephone: (949) 383-2800
Facsimile: (949) 383-3801

Mark P. Robinson, Jr.
Kevin F. Calcagnie
Daniel S. Robinson
**ROBINSON CALCAGNIE ROBINSON**
**SHAPIRO DAVIS, INC.**
19 Corporate Plaza Drive
Newport Beach, California 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292

*Attorneys for Plaintiffs Timothy L. Strader,*
*Sr., Lester L. Hall, Jr. and All Others*
*Similarly Situated*

## DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of all members of the proposed Class, hereby demand a jury trial for all claims so triable.

DATED:  December 10, 2015

By:     /s/ Michael I. Katz
Alan A. Greenberg
Wayne R. Gross
Michael I. Katz
Evan C. Borges
Michael P. McMahon
**GREENBERG GROSS LLP**
650 Town Center Drive, Suite 1750
Costa Mesa, CA 92626
Telephone:  (949) 383-2800
Facsimile:   (949) 383-3801

Mark P. Robinson, Jr.
Kevin F. Calcagnie
Daniel S. Robinson
**ROBINSON CALCAGNIE ROBINSON
SHAPIRO DAVIS, INC.**
19 Corporate Plaza Drive
Newport Beach, California 92660
Telephone:  (949) 720-1288
Facsimile:   (949) 720-1292

*Attorneys for Plaintiffs Timothy L. Strader,
Sr., Lester L. Hall, Jr. and All Others
Similarly Situated*

CLASS ACTION COMPLAINT